**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| DEANNA STROTHERS, | ) | Civil Action No.:  2:23-cv-05878-DCN-MGB |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **Violation of Title VII:** |
| vs. | ) | **Harassment and Termination** |
| | ) | **Based on Gender/Homosexuality** |
| CARMAX AUTO SUPERSTORES, INC., | ) | **and Retaliation** |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

The plaintiff above named, by and through undersigned counsel, complains of the acts of the defendant as follows:

## PARTIES AND JURISDICTION

1.     That the plaintiff is a citizen and resident of the County of Dorchester, State of South Carolina.

2.     That, upon information and belief, the defendant CarMax Auto Superstores, Inc. ("CarMax" or "defendant") is a foreign corporation doing business and maintaining offices and agents in various counties throughout the State of South Carolina, including the County of Charleston, State of South Carolina.

3.     That this court has federal question jurisdiction of the above-styled action pursuant to the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 3 and 5 ("Title VII"), and 28 U.S.C. § 1331.

4.     That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, in that, pursuant to 28 U.S.C. § 1391(b), the parties reside and

1

defendant does business in this district and division, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

5.     That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.     That at all relevant times as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII and is otherwise subject to said Act.

7.     That on or about March 16, 2023, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination in the form of harassment and termination based on gender and homosexuality and retaliation for engaging in protected activities, all under Title VII.

8.     That on or about September 13, 2023 plaintiff received a Notice of Rights to Sue from the EEOC regarding the Charge described in Paragraph 7 above.

9.     That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which she received the Notice of Rights to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.     That plaintiff is a homosexual female married to a woman.

12.    That plaintiff was recruited to interview with defendant by and through a headhunter.  Interested in the opportunity, plaintiff contacted defendant and was then put through a series of interviews, with the last one being conducted at defendant's Gastonia, North Carolina location.  On this occasion, plaintiff was interviewed by Cate Schulz ("Schulz"), the Business Office Manager, and Nate Davis ("Davis"), the Location General Manager at the Gastonia store.

13.    That having worked in this type of managerial position for over thirty (30) years, plaintiff performed well during the interviews and was offered a job by defendant as a Business Office Manager in Training, which she accepted.  In this position plaintiff was to start in one location under the tutelage of an experienced Business Office Manager who would teach plaintiff to perform the duties of the job.  Then, after approximately ten (10) months of training in an initial store, plaintiff would be assigned to a new store of her own, thereby becoming the Business Office Manager at the new location.

14.    That as such, on or about October 18, 2021 plaintiff began working for defendant as the Business Office Manager in Training at its Gastonia, North Carolina location. In her new position plaintiff reported to (and was trained by) the Business Office Manager, Schulz, who reported to the Location General Manager, Davis.  Davis, in turn, reported to a Regional Vice-President, Jamie DeJesus ("DeJesus"), who is female.

15.    That with the exception of a couple bumps in the road, plaintiff's time at defendant's Gastonia store was positive and plaintiff not only performed her job duties there in an exemplary fashion, but plaintiff was a fast study, learning the job in a short period of time.

16.    That as to any small bumps in plaintiff's time there, one occurred when another employee at the Gastonia location asked plaintiff if plaintiff's wife was the "dyke" in the relationship.

17.    That immediately after asking the inappropriate question, and likely after seeing the look of surprise and disbelief on plaintiff's face, the employee exclaimed, "Oh no! Can I not ask that?"  Though plaintiff was offended, she is a firm believer that employees should be coached and retained whenever possible.  As such, plaintiff  calmly explained to the coworker that her question was not appropriate and was offensive.  Based on plaintiff's experience as a manager, plaintiff felt no further action was needed against the employee.

18.    That the following day though, Schulz approached plaintiff and disclosed that she had heard the coworker's remark the previous day; that she had spent a good bit of the prior evening thinking about what to do about it, if anything, but that, in the end, she concluded she had to submit an HR Ticket (or bring the incident to the attention of Human Resources) which she did that day.

19.    That the following day, a Human Resource employee named Myron contacted and interviewed plaintiff about what had happened with the coworker.  After the interview, Schulz terminated the coworker – an event which caused a significant distraction at the store and a lot of misplaced resentment toward plaintiff based on the false belief that plaintiff called Human Resources and that plaintiff got the employee fired.  For example, the other associates started to treat plaintiff as an outsider; they began to ignore plaintiff's directives as a supervisor; and they otherwise shunned and isolated plaintiff.

20.    That fortunately, the particular female employee who was stirring up and driving all of the collective hostility toward plaintiff resigned from defendant shortly after the incident.  Thereafter, harmony was restored in the workplace and plaintiff had no more issues or conflicts with any of the employees there.

21.   That the other bump in the road came when, after only about five (5) months of training plaintiff, Schulz announced she had been promoted by the defendant into a position at another one of its stores and that she would be leaving the Gastonia location shortly.  At the same time, no arrangements had been made to hire a replacement for Schulz at the store, leaving plaintiff alone without receiving the benefit of the full duration of her training.

22.   That as such, shortly after Schulz's announcement, and with only about half of plaintiff's training completed, plaintiff was put in charge of the Gastonia location.  Eager to prove herself, plaintiff had mixed feelings.  On one hand plaintiff felt she was ready to be a leader.  But on the other hand, plaintiff was a bit anxious at being asked to take over the location without full training.  To make matters worse, defendant did not give plaintiff any tools or means to compensate for that lack of training.  Plaintiff even conveyed her concerns in this regard to the Location General Manager, Davis, but still nothing was done.  In the end, though, plaintiff's prior management experience and her overall skillset kicked in and plaintiff met the challenge, leading her team and performing her job duties in an exemplary fashion.

23.   That in or around May of 2022, management at defendant asked plaintiff if she would travel to the Charleston, South Carolina CarMax facility to assist in the office there, as the Charleston store had been without a leader for some time and was experiencing issues with low morale, infighting between employees and even other departments, civility and professionalism,  and it was behind on some of its tasks.  Plaintiff agreed to travel to South Carolina and lend a hand at the Charleston location.  Thus, for the next three (3) weeks plaintiff traveled back and forth between North and South Carolina, working and helping out at both the Gastonia and Charleston locations.

24.   That plaintiff's hard work at defendant's Charleston location paid off, as after about three (3) weeks of working intermittently at that store, the Location General Manager there, Tom Burke ("Burke"), a male, advised plaintiff that he would like to hire plaintiff on as a permanent, full-time employee at the Charleston location.   He further instructed plaintiff to access her CarMax Workday Account and to apply for the Operations Manager position at the store, a position that was already open, posted and available and was the same position plaintiff already held, only now it had a different name.

25.   That after confirming with the Regional Vice-President DeJesus that the job in Charleston would, indeed, come with a raise in pay, plaintiff did as instructed and applied for, was offered, and accepted the Business Operations Manager position at the CarMax store in Charleston, South Carolina.

26.   That shortly thereafter, and in reliance on defendant's clear promises, plaintiff and her wife packed up their belongings at their home in North Carolina and moved to South Carolina – a venture which involved plaintiff moving away from her family, and plaintiff's wife leaving a secure, dependable job.   It also involved plaintiff and her wife purchasing a new home in the Charleston area.   Otherwise, somewhere around May 24, 2022 (about a week before Memorial Day) plaintiff had already started to work at her new job in Charleston.

27.   That as to the chain of command at the Charleston location, in plaintiff's role as Business Operations Manager she reported directly to Burke, the Location General Manager, who worked on location in Charleston with plaintiff.   For his part, Burke reported to a Regional Vice-President, DeJesus, who worked out of Atlanta, Georgia.   DeJesus was in that position as of the date plaintiff was hired and continued to occupy it until on about September 1, 2022 at which

time Joe Holder ("Holder"), a male, out of Charlotte, North Carolina, was hired into the position. Otherwise, on plaintiff's side of the business there were two (2) other Operations Managers, both of whom reported to Burke – Cinnamon Long ("Long"), a female who was the Service Operations Manager, and Dawson Fowler ("Fowler"), a male who was the Purchasing Operations Manager. Burke and the three (3) Operations Managers who reported to him were all considered senior leadership at the Charleston location.

28. That for plaintiff's part, she had approximately thirteen (13) Business Associates and three (3) Lead Business Associates that reported directly to her and whom plaintiff had full supervisory authority over, including the authority to hire, discipline, and fire (with approval). At the same time, all three (3) Operations Managers, including plaintiff, were responsible for the day-to-day coaching and leadership of three (3) Sales Managers: Wes Case ("Case"), Ed Clapper ("Clapper") and Richard Jones ("Jones") (all of whom are male), although technically they reported directly to Burke.

29. That in addition to all of the above, the Charleston location fell within the territory of a management-level Human Resources employee, Chan Tharpe ("Tharpe"), an African-American male who would make periodic visits to the dealership in Charleston and who was in constant contact with that store. For the most part, other than Tharpe, the above employees were Caucasian. To plaintiff's knowledge and understanding, none of the above-named management-level employees were homosexual.

30. That at all times during plaintiff's employment at defendant, in both North Carolina and South Carolina, plaintiff performed her job duties in an above-satisfactory fashion and otherwise maintained an outstanding work record with the company. Though defendant never provided plaintiff with any formal written performance evaluations, plaintiff did receive

daily scorecards which analyzed aspects of plaintiff's performance and rated plaintiff's team's standing in their region. To this point, plaintiff always received good or "green" scores on her daily scorecards and plaintiff's stores always enjoyed high regional rankings. Moreover, plaintiff's supervisors at both locations routinely praised plaintiff's performance; plaintiff was never disciplined the entire time she worked at defendant in any shape or form, despite the fact that defendant has and uses a progressive discipline policy; and plaintiff received at least two (2) raises during her brief employment there.

31. That when plaintiff took over the dealership in Charleston, Burke warned plaintiff that she was walking into a mess (or words to that effect), referring to the above-mentioned low morale, respect and civility issues, confusion, infighting and untimely completion of tasks. As such, one of plaintiff's first projects was to make immediate efforts to bring the team together and to instill a team mentality into them, including the ever-important notion of professionalism, respect and civility.

32. That as an experienced manager, plaintiff observed that when it was announced plaintiff would have a permanent position in Charleston, the employees there appeared to embrace plaintiff's presence, and appeared relieved and happy to have a stable leader in the store. Unfortunately, within just a few days of starting her job at the Charleston location, defendant, and its employees, including upper management, began to discriminate against and harass plaintiff, all on account of plaintiff's homosexuality. While it would be extremely difficult to itemize each incident due to the sheer number of them, they included, but are not limited to, the following:

❖ In or around early June of 2022, (a few days after plaintiff was introduced as the new Business Operations Manager) Burke asked plaintiff if plaintiff could take on the task of preparing and overseeing the diversity board located in the breakroom at the facility. (Defendant

supplies the topics to be presented on the board on the diversity page of its website, "CarMax World.")  Never one to refuse a task, let alone one that is close to her heart, plaintiff agreed to do it.  Thereafter, plaintiff went to work personally creating the board and choosing "Juneteenth" and "Pride" as the topics to be displayed on it for that month.  In all events, the board was prepared in a business-like and professional manner, promoting diversity in the workplace which, of course, during that month featured the LGBTQ community and homosexuality.  The board did ***not*** encourage anyone to "become gay" nor did it flaunt the topic.  Instead, it merely encouraged positive interaction with a group of citizens that now have become a protected class under federal law.

The very next day, Tharpe from defendant's Human Resources Department arrived at the Charleston location from Atlanta.  At some point during that day plaintiff walked into the breakroom, only to find Fowler, a high-level management employee, and two (2) male Sales Consultants, Hugh Laughlin ("Laughlin") and Nate Kluft ("Kluft"), conversing about homosexuals and about the board plaintiff had just prepared, in demeaning, derogatory and offensive terms.  While Fowler saw plaintiff enter the room, the other two men had their backs turned to plaintiff as she walked in. Nevertheless, plaintiff heard Laughlin say that he did not "want to look at this shit for 30 days" and that, before plaintiff arrived at the dealership, no one was pushing homosexuality down the employees' throats.  Likely taking a cue from Fowler, a management-level employee who did absolutely nothing to deter or stop the discriminatory conversation, the two Sales Consultants further remarked that it was "not fair" and that they were not interested in this gay "propaganda;"

❖ Highly offended by what she had just observed, plaintiff immediately walked into Burke's office to find Burke and Tharpe the Human Resources Manager (of all people) there, though Tharpe was on the phone.  After explaining to Burke what she had just observed, Burke, an even higher-level manager than Fowler (and plaintiff's direct supervisor) replied, in front of the Human Resources Manager, "I mean, you live in the deep South. What do you expect, Deanna." Plaintiff replied, "I expect you to provide a safe place for me to work." To plaintiff's knowledge, none of the three (3) offending employees were spoken to, admonished, or otherwise disciplined.  Neither was Burke for his discriminatory reaction to plaintiff's harassment complaint, despite the fact he made the remarks in front of one of the company's Human Resource Managers.

At the end of that same day, Tharpe approached plaintiff and asked to speak to her.  After walking outside together, Tharpe told plaintiff that

he had heard some of the conversation between Burke and plaintiff earlier that day in Burke's office and that "It didn't feel good or right" to him. Pleased and happy to finally have an ally on the issue, plaintiff provided Tharpe with more details regarding the earlier discriminatory remarks and Tharpe told plaintiff he would be back in the morning;

❖ The next morning, Burke, Tharpe and plaintiff walked into the breakroom together to look at the board and ensure it met CarMax's standards. (This rather than immediately investigating and/or disciplining the three (3) offending employees who made the discriminatory remarks.) Once in the breakroom, and again in front of Tharpe, Burke opined that the messaging on the board needed to be "softened up" due to the negative reactions it was provoking in the store. To his credit, Tharpe replied, "Absolutely not. The board is perfect." Tharpe then directed Burke to have an "all managers" meeting to ensure they all understood and followed the company's diversity work rules and philosophy and to ensure that they would all continue to follow them going forward;

❖ The next day, Burke had the meeting as directed. Present at the meeting along with Burke and plaintiff were Long and Fowler (plaintiff's peers in the same position) and Sales Managers Case, Clapper and Jones. During the meeting, Case stated, in front of his direct supervisor, Burke, and the three supervisors who managed him on a daily basis, that he thought that those that don't agree with the LGBT community had as much right to voice their opinions as those "waving their rainbow flags." Shocked, upset and offended, plaintiff got up and left the meeting in tears, finding her way to the women's room to gather her composure. Plaintiff returned to the meeting only to hear Burke saying that his daughter's best friend was a lesbian, so he clearly had no issue with that "lifestyle choice" – emphasizing the word "choice." In response, plaintiff advised Burke that homosexuality was not a "lifestyle choice." After the meeting, plaintiff spoke to Burke and clarified that she became upset during the meeting because Case's remarks, and Burke's failure to admonish Case or to react to the statements, sent an erroneous and damaging message to others about plaintiff's protected class, making it feel as though plaintiff was being personally attacked. Burke responded to plaintiff's complaint again in an inappropriate manner by telling plaintiff she just had to "toughen up" and not get upset every time someone talks about the topic. Nevertheless, Burke did start an investigation in response to plaintiff's complaints;

❖ Shortly after this, the Regional Vice-President, DeJesus, called plaintiff for an update on how plaintiff was doing in her new role. During the call, DeJesus advised plaintiff that she **had already heard**

*about the diversity issues in Charleston*; that she could not promise she could fix it; but she could transfer plaintiff out of the store – a remedy plaintiff shot down immediately, as plaintiff is not a quitter and never did anything wrong. DeJesus further apologized to plaintiff for the discriminatory behavior plaintiff was having to deal with; she offered plaintiff support; and she promised she would visit the store to "catch up" with plaintiff once the investigation concluded. Otherwise, DeJesus took no action in regard to the harassment; she did not suggest any remedies for it to plaintiff; and naturally, the harassment/discrimination continued;

❖ In the meantime, the two Salesmen, Laughlin and Kluft, *physically destroyed the diversity board plaintiff had created.* In first seeing the damage to the board, plaintiff became upset and heartbroken. Plaintiff picked up the pieces and put the board back together again the best she could. Not to be deterred, and with no one stopping them, Laughlin and Kluft once again destroyed the diversity board, and again plaintiff fixed it. This insidious and egregious conduct went on repeatedly, all throughout the month of June, with the employees destroying the board and plaintiff fixing it. By way of example, the offending employees would take all the pictures off the board, crumple them up, and throw them in the trash. On another occasion, they turned the pictures around, pinning them back on the board backwards;

❖ On or about Saturday, June 25, 2022, and in an effort to build diversity in the workplace, Burke, Burke's wife and plaintiff, along with others, attended and actually walked in the Charleston Pride Parade. This gathering had been submitted to and preapproved by corporate as a community event. However, upon arrival, it soon became clear that the entire effort was a joke to Burke, as he continually made negative, rude or sarcastic remarks about homosexuals, the parade, the music being played at the parade, and at one point exclaiming he had no idea there were so many gays in Charleston. After about 20 minutes, Burke left the parade, nowhere to be found;

❖ About a week later, when Burke unsuccessfully lobbied for the termination of an African-American female employee, he became frustrated and blurted out words to the effect of, if the employee was not female and black, she would have been fired;

❖ In or around mid-August of 2022, the wife of a Sales Consultant, Kevin Soucy ("Soucy"), brought a birthday cake into work for her husband. In the process, many employees gathered in the conference room to cut the cake and celebrate. In the middle of the gathering, Soucy's wife approached plaintiff exclaiming, "Oh, you must be the new manager." When plaintiff replied in the affirmative, adding that

11

she and her wife had just moved to South Carolina, Soucy's wife stated, in front of all those present, "Oh honey, we have the perfect church for you. Only God can save you now!" However, when plaintiff immediately relayed the incident to Burke, not only did Burke ignore the underlying complaint, but he threw fuel on the fire, stating words to the effect that, "You're going to get that in these parts. It's the deep South" and "People are not ready for your kind." Intensely offended yet again, plaintiff just walked away;

❖ Not long after the above incident, Burke approached plaintiff and asked if plaintiff called Human Resources on him for potential diversity violations. Then, in an accusatory manner, Burke told plaintiff there was a rumor going around that plaintiff had promoted an associate because the associate was gay like plaintiff and that plaintiff had then boasted, "We all stick together" in the course of the promotion. Of course, plaintiff truthfully told Burke that she had not reported him and that she had not promoted any employee because they may be homosexual. Plaintiff also reminded Burke that he had personally signed off on the associate's promotion without objection. Faced with these irrefutable facts, Burke ended the conversation;

❖ On another occasion around this same timeframe, a Business Office Associate, Gayle Ruby ("Ruby"), approached plaintiff and began to talk about her family. Naturally, plaintiff showed Ruby pictures of her children (two of whom are African-American) and plaintiff's grandchildren (both of whom are African-American). In response, Ruby asked plaintiff "How can you have black grandkids when you are gay?" Again, plaintiff reported the incident to Burke; again Burke did nothing; and again, the harassment continued.

33. That to provide a more-specific context, the above-described discriminatory remarks and behavior occurred on a regular basis, at least three (3) times a week (or more). And as indicated, despite plaintiff's many complaints, defendant never remedied the problem and the harassment continued.

34. That on or about September 2, 2022, plaintiff received a call from a customer who had recently visited the dealership. The customer conveyed that, while there, they heard a female Business Associate of plaintiff's, Cory Fulmer ("Fulmer"), badmouthing and speaking poorly about CarMax and its business office. The customer explained that he understood jobs

can be stressful and that we all have bad days, but that Fulmer was particularly vocal that day and he felt management should know.

35.    That the following day, September 3, 2022, plaintiff walked up to the front of the office window to get a blank yellow jacket (or file) out of the drawer.  To plaintiff's surprise, plaintiff noticed Fulmer was on the computer looking for another job on Indeed.com.   In response, plaintiff leaned over and quietly told Fulmer to perform that personal task on her own time.  Fulmer complied with the directive and went back to work.

36.    That at the end of the day, plaintiff told Fulmer about the complaint the customer had made against her the prior day.  Fulmer denied any such conduct.  In a sincere attempt to assist her employee, plaintiff remarked that she could see Fulmer was not happy at CarMax and plaintiff asked what she could do to change that.  Fulmer replied in an uninterested tone that she did not know.  Still attempting to appease Fulmer – an employee with chronic conduct issues – plaintiff offered to place her in another job at CarMax and to even support and assist her if she decided to pursue opportunities outside of defendant.  But there was no pleasing Fulmer.  This was the full extent of the conversation.   It was civil and brief.

37.    That on or about September 5, 2022, Sales Manager Jones told plaintiff that the previous night plaintiff's Lead Business Associate, Whitney Brown ("Brown"), had told him that some of plaintiff's employees were attempting to get rid of plaintiff.  That same evening, plaintiff confronted Brown, asking why she would go to Jones with that sensitive information instead of coming directly to her first.  Brown replied she did so because plaintiff had already left work for the day and she didn't want to bother plaintiff.  Brown further explained that she had knowledge that Fulmer (the woman plaintiff had just counseled) and one or two other employees were going to call CarMax's "cool line" and report that plaintiff was showing favoritism towards

Lexi White ("White") by letting her prep the cars the prior Sunday.  Apparently somewhere around this time Fulmer and/or Brown sent an email to Human Resources making trivial and false complaints about plaintiff, yet no one bothered to tell plaintiff.

38.  That later that day, and throughout the week, several of plaintiff's employees let plaintiff know that she was the subject of an HR investigation.  Some of these employees told plaintiff that Human Resources had contacted them for an interview, and some indicated that Human Resources was asking for a statement from them.  All such employees, including, but not limited to, Maria Baxter ("Baxter"), Lexi White, and Rhonda Scott ("Scott") and other employees named Maria, Marlow and Talia further expressed unconditional support for plaintiff and a hesitancy to even be involved in any investigation.  One employee even tried to show plaintiff her statement of support, leaving it on plaintiff's desk.  This particular employee advised plaintiff that it appeared the Human Resource employee questioning her was not pleased with her answers, asking the same question over and over again until she received an answer acceptable to her.  All the while, no one from defendant even told plaintiff she was the subject of a Human Resources investigation.

39.  That on or about September 18, 2022, Fulmer approached plaintiff and asked to speak with her.  As always, plaintiff agreed and they both walked outside of the building to the drive aisle where Fulmer tendered her verbal resignation and two weeks' notice to plaintiff.  In response, plaintiff politely replied she was sorry to lose Fulmer as a part of her team and commented that she knew Fulmer was struggling at the Charleston store.  Fulmer then advised plaintiff that she was resigning because of the quality of the cars at CarMax and because the customer complaints to the business office were taking a toll on her.  Experienced in such circumstances, plaintiff told Fulmer that she fully understood and supported her decision to

resign.  For whatever reason, Fulmer, an employee with a host of conduct-related issues, told plaintiff that she had called the "cool line" and made complaints against plaintiff about issues she perceived in the Business Office.  Again, as an experienced manager, plaintiff merely replied, "It is what it is" and that HR would do their job.  That is the full extent of the conversation.  It was civil and appropriate.

40.  That sure enough, and unbeknownst to plaintiff at the time, Fulmer made a verbal and then a written complaint (in the form of an email) against plaintiff on the CarMax cool line.

41.  That the following day, plaintiff advised Burke that Fulmer had resigned and tendered her two-week notice.  Burke asked plaintiff if he could just pay Fulmer for the notice period and send her home.  Plaintiff replied that she did not know.

42.  That on or about Tuesday, September 20, 2022, Burke advised plaintiff that Tharpe had given him permission to pay Fulmer for her two-week-notice period and to immediately release her from performing further job duties for the company.  Based upon plaintiff's recent dealings with Fulmer, plaintiff stated that she would not feel comfortable delivering the message to Fulmer.  Burke apparently agreed, as plaintiff played no role in telling Fulmer anything about her two-week-notice period or when she had to leave the premises. Instead, plaintiff's role was limited to getting Fulmer, bringing her back to Burke's office and witnessing the exchange between Burke and Fulmer, which is exactly what she did.

43.  That once Fulmer was in Burke's office, Burke told Fulmer the company was paying her for the remaining time of her two weeks' notice period and that she need not work out the remainder of her notice period.  In response, Fulmer only asked Burke if he wanted her to work out the rest of her shift that day, to which Burke responded in the negative.  Fulmer left and

that was all that was said.  Again, the above exchange was civil and polite.  Yet after the meeting, Fulmer marched to the Business Office and falsely exclaimed to all present that she had just been fired.

44.  That same day (September 20, 2022) plaintiff brought her newly-purchased vehicle (one plaintiff had purchased at CarMax) to a third-party dealership, Jeep Hendrick, for repairs since CarMax was unable to fix it.  Burke offered to pick up plaintiff that day from the dealership and drive plaintiff to work.  As they drove back to work in Burke's car, plaintiff and Burke engaged in small talk which culminated with Burke stating, "Listen.  I have no problem with gays, lesbians or transpeople. I just don't want them in my living room."  Of course, plaintiff was offended and hurt by the harsh and discriminatory words of her supervisor.

45.  That two (2) days later, on or about September 22, 2022, plaintiff was directed to participate in a telephone call with a Human Resource Investigator, Michaela Gallo ("Gallo"), and the new Regional Manager, Holder, who had recently replaced DeJesus.  During the call, plaintiff was told for the first time that she was the subject of a Human Resources investigation resulting from a complaint made by one or two employees alleging that plaintiff had violated the company's policies regarding treating others with respect.

46.  That during the call, Gallo questioned plaintiff for over an hour in an unduly aggressive and accusatory manner.  Indeed, Gallo refused to accept plaintiff's truthful answers; she repeatedly accused plaintiff of not being truthful; and her negative tone and demeanor in questioning plaintiff was far out of proportion to the seriousness of any work rules plaintiff was falsely accused of violating.  Of course, plaintiff kept her composure and answered all questions truthfully.  However, when plaintiff finally had a chance to speak, she reported the repeated and continuous harassment and discrimination that she was forced to endure at the Charleston

dealership on account of her homosexuality, thereby engaging in protected activity under federal anti-discrimination laws, namely Title VII.

47. That in the end, the complaint against plaintiff boiled down to four (4) allegations or incidents, all of which were false (or lacked credibility) and all of which were disproven by plaintiff during the meeting by merely responding to Gallo's questions. These incidents are as follows:

- ❖ When plaintiff first came on board in Charleston four (4) months earlier – back in May of 2022 – plaintiff told one of her Business Associates, Alaeyshia Moore ("Moore") to "shut up" during a Business Office meeting;

- ❖ Plaintiff forged the title to a car and handed it to Lexi White;

- ❖ Plaintiff told Fulmer that she should quit because of her mental illness; and

- ❖ That in general, plaintiff had a harsh communication style.

48. That before adjourning the meeting, Gallo directed plaintiff to prepare a written statement addressing each allegation. As such, later that same day, plaintiff prepared the requested statement in the form of an email and sent it to Gallo. In the email, plaintiff again denied all of the allegations against her and she again reported that she had been harassed and discriminated against at the dealership on account of her homosexuality, thereby engaging in legally-protected activity under Title VII for the second time that day.

49. That as to the allegations of work rule violations made against plaintiff, they were all false and lacked credibility. None of the said allegations were backed up by evidence but, rather, they were all the dubious complaints of one or two disgruntled employees.

50. That to plaintiff's understanding, nine (9) of plaintiff's associates were interviewed by Human Resources. Plaintiff understands that they all supported her, but that

White, Fulmer and Brown made some negative remarks about plaintiff.  In all events, plaintiff submitted her truthful written statement to Human Resources after the meeting as directed, expecting to be fully exonerated.

51.  That on or about September 24, 2022, Ashley Cattles ("Cattles"), a former associate who was employed at CarMax's Charleston location when plaintiff arrived there but had since left the company, walked into the store to purchase a car.  In the process, she approached Lead Business Associate J.C. Martinez ("Martinez"), who was at the Business Office window and asked Martinez in a loud voice if the "mohawk bitch" (which is a clear reference to plaintiff) still worked at the store.   No one admonished Cattles.  Later, Martinez conveyed the remark to plaintiff, thereby contributing to the hostile work environment.

52.  That on or about September 27, 2022, Gallo and Holder called plaintiff back in for another phone interview – this time to question plaintiff about her allegations of harassment based on homosexuality.  Fortunately, Gallo softened her tone and demeanor when questioning plaintiff on this topic.  During the interview, plaintiff told both persons what she could recall about the harassment and provided examples.  Again plaintiff was directed to prepare a written statement regarding these allegations.  And, again, that same day (September 27, 2022) plaintiff prepared her written statement in the form of an email and sent it to Gallo and Holder, thereby again engaging in protected activity under Title VII for the second time that day.

53.  That thereafter, all was quiet at the store for the next three (3) weeks.  Plaintiff continued to perform her job during this time in a satisfactory fashion, as plaintiff had done the entire time she was employed with defendant.  Then, on or about October 17, 2022, Holder instructed plaintiff to meet with Human Resource employees the following day at 7:30

a.m. to discuss the results of the investigation conducted into plaintiff's complaints of discrimination.

54. That on or about October 18, 2022, plaintiff arrived to work for the meeting. As plaintiff pulled into the premises parking lot, plaintiff's supervisor, Burke, pulled in right behind her. Naturally, the two then walked into the office together. Once inside, Holder and another gentleman took Burke into his (Burke's) office, while Tharpe, the Human Resources Manager, and another man, Wes, took plaintiff into a conference room. Once all parties were seated in the conference room, plaintiff observed that Wes appeared nervous. In fact, as he started to speak, his hands and his lips began to shake or tremble. Keeping his dialogue short, Wes told plaintiff the company had completed its investigation into plaintiff's allegations of harassment and discrimination. Then, instead of sharing the results of the investigation with plaintiff, Wes told plaintiff she was fired for failure to treat other employees with respect – a reason that is false, unworthy of credence, and given to plaintiff without warning, notice, prior discipline, or cause. After returning her keys and badge, Tharpe walked plaintiff to plaintiff's office, ostensibly so that Tharpe could witness plaintiff when she collected her personal belongings.

55. That as plaintiff was packing up her office, and in an attempt to reconcile her confusion regarding Tharpe's seemingly inconsistent positions, plaintiff looked at Tharpe and said, "Chan, you know this isn't right. You know I didn't do anything wrong." In response, Tharpe said, *"I know"* followed by "You are a great leader and you are resilient. You will be fine." When plaintiff took issue with the statement that she would be fine, reminding Tharpe that she had moved away from her family and that plaintiff's wife had moved away from her job just to help the store, and that no one was hiring, Tharpe replied, "Job? You don't need a job.

You're a smart girl.  You know what to do." – clearly encouraging plaintiff to take legal action against the defendant.

56.   That when Tharpe and plaintiff went outside to retrieve plaintiff's personal belongings from the demo car, Tharpe, without provocation, told plaintiff that, "You will be fine. You're a great person and a great leader."

57.   That later that morning Schulz (who had apparently been told about plaintiff's termination) sent plaintiff an email which contained information identifying an attorney who, a year or so earlier, had represented a CarMax employee in a wrongful termination suit against them.

58.   That upon information and belief, following plaintiff's termination, defendant assigned other employees to perform the duties of plaintiff's job and/or hired other employees into plaintiff's position, all of whom were outside of plaintiff's protected class, i.e., persons who are not gay and/or who had not engaged in protected activity (or made complaints of discrimination).

## FOR A FIRST CAUSE OF ACTION:
## VIOLATION OF TITLE VII:
## DISCRIMINATION/TERMINATION
## BASED ON HOMOSEXUALITY AND GENDER

59.   That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 hereinabove as fully as if set forth verbatim.

60.   That at all pertinent times, as defined by Title VII, defendant employed fifteen (15) or more employees and, as such, defendant is an "employer" as defined by Title VII, and is otherwise subject to that Act.

61.   That plaintiff is a homosexual female and, thus, a member of at least two (2) protected classes which defendant was aware of during plaintiff's employment there.

62. That plaintiff performed her job duties at defendant in a manner that met defendant's reasonable and legitimate expectations, as plaintiff was never disciplined at defendant; her daily score cards were all satisfactory; and supervisors at both the North Carolina and South Carolina locations praised plaintiff's job performance.

63. That despite the above, defendant fired plaintiff.

64. That after firing plaintiff, defendant replaced plaintiff with persons outside of plaintiff's protected classes by hiring persons and/or by assigning existing employees to perform the duties of plaintiff's prior job; and/or it kept plaintiff's position open; and/or it fired plaintiff under circumstances which give rise to an inference of discrimination.

65. That in reality, defendant fired plaintiff because plaintiff is homosexual and/or female, as defendant fired plaintiff, a good worker with no discipline in her file, without warning, notice, prior discipline or cause and for false reasons and/or reasons unworthy of credence. Moreover, plaintiff's coworkers and supervisors all made derogatory remarks about plaintiff's homosexuality and expressed hostility towards plaintiff's protected groups.

66. That as such, defendant violated Title VII by firing plaintiff because of plaintiff's homosexuality and gender.

67. That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks her reasonable attorney's fees and costs and prejudgment interest.

68. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF TITLE VII:**
**RETALIATION**

69. That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 68 hereinabove as fully as if set forth verbatim.

70. That at all pertinent times defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII, and otherwise subject to the said Act.

71. That plaintiff engaged in protected activity on several occasions while employed with defendant, the last time being on or about September 27, 2022 when she complained about and opposed discrimination based upon her homosexuality and gender during her phone interview with Gallo and Holder.

72. That defendant fired plaintiff within about three (3) weeks after plaintiff last engaged in protected activity. Thus, a causal connection exists between plaintiff's protected activity and termination by virtue of the short period of time that passed between the two (2) events.

73. That defendant fired plaintiff without warning, notice, prior discipline or cause and for false reasons and/or reasons unworthy of credence, as defendant really fired plaintiff in retaliation for engaging in protected activity in violation of Title VII, 42 U.S.C. § 2000e-3.

74.    That as a result of defendant's action as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

75.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A THIRD CAUSE OF ACTION**
**VIOLATION OF TITLE VII:**
**HARASSMENT**
**BASED ON HOMOSEXUALITY AND GENDER**

76.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 75 hereinabove as fully as if set forth verbatim.

77.    That at all pertinent times defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII, and otherwise subject to the said Act.

78.    That plaintiff is homosexual and female and, thus, belongs to at least two (2) protected classes, both of which defendant was aware of during plaintiff's employment with defendant.

79.    That defendant's actions, by and through its employees and supervisors, subjected plaintiff to unwelcome harassment, all of which plaintiff objected to repeatedly.

23

80.    That the said harassment was based upon plaintiff's homosexuality and gender.

81.    That defendant's harassment was severe and pervasive to the point that it altered the terms and conditions of plaintiff's employment at defendant and it otherwise created an abusive working environment for her as it occurred approximately three (3) times a week or more.

82.    That plaintiff objected to the harassing conduct and was offended by it.

83.    That defendant's actions as alleged above created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

84.    That defendant was aware of the harassment as plaintiff complained about the above-described harassment directly to defendant on numerous occasions and defendant was otherwise on notice that the harassment was occurring as it occurred openly and on a widespread basis at the defendant and supervisors at defendant participated in the harassment.

85.    That despite the above, defendant wholly failed to take prompt and effective remedial action to end the harassment, and defendant continued to harass and discriminate against the plaintiff due to her homosexuality and gender, even though plaintiff complained about the harassment and/or after defendant became aware of the harassment or should have been aware of it.

86.    That the actions of defendant in subjecting plaintiff to unwanted harassment, all as described above, constitutes discrimination against plaintiff based on her homosexuality and gender, all in violation of Title VII.

87.    That as a result of defendant's action as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated

with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

88.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, as to all of plaintiff claims under Title VII, plaintiff prays for judgment against the defendant for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the cost and disbursements of this action, including plaintiff's reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  *s/A. Christopher Potts*
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
November 16, 2023